UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
EVENSLEY JEAN PIERRE,

              Petitioner,              **MEMORANDUM & ORDER**

       - against -             06-CV-1573 (NGG)

UNITED STATES OF AMERICA,

              Respondent.
-----------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

On November 19, 2003, a jury found Petitioner Evensley Jean Pierre ("Petitioner") guilty

of conspiracy with intent to distribute cocaine and attempted possession of cocaine with intent to

distribute. (03-CR-445, Docket Entry # 35; <u>see</u> 03-CR-445, Docket Entry # 10 ("Indictment") at

2-3.) The evidence at trial established that Petitioner made an agreement to smuggle from Haiti

into the United States 2,553 grams of cocaine. The evidence at trial also established that

Petitioner attempted to take possession of the cocaine from Jean Menelas ("Menelas"), a drug

courier who flew from Haiti to John F. Kennedy Airport ("JFK") in Queens, New York.

On February 11, 2005, the court sentenced Petitioner to 97 months of imprisonment

followed by four years of supervised release. (Government's Response in Opposition ("Gov't

Resp.") (Docket Entry # 12) at 2.) On December 29, 2005, the Second Circuit affirmed

Petitioner's conviction. <u>United States v. Evensley Jean Pierre</u>, 161 Fed. Appx. 121 (2d Cir. Dec.

29, 2005).

Petitioner now brings this motion for a writ of habeas corpus pursuant to 28 U.S.C. §

2255 <u>pro se</u> , seeking to vacate his sentence on the ground of ineffective assistance of trial

counsel. For the reasons set forth below, Petitioner's motion is denied.

# I.     FACTUAL AND PROCEDURAL HISTORY

## A.     Indictment and Pre-Trial Negotiations

On March 18, 2003, Immigration and Customs Enforcement ("ICE") agents arrested
Petitioner and Menelas at JFK. (Trial Tr. ("Tr.") at 79.) On March 19, 2003, Petitioner was
arraigned in the Eastern District of New York. (03-CR-445, Docket Entry # 2.) The court
appointed attorney Paul J. McAllister ("McAllister") as Petitioner's counsel. (03-CR-445,
Docket Entry # 6; see Gov't. Resp. Exh. A, Decl. Of Paul J. McAllister ("McAllister Decl.") at
1.) On April 16, 2003, a grand jury indicted Petitioner for, inter alia, conspiracy to possess 500
or more grams of cocaine with intent to distribute and attempting to possess 500 or more grams
of cocaine with intent to distribute, both in violation of 21 U.S.C. § 846. (Indictment at 2-3.)

On or about May 2, 2003, the United States ("Respondent") provided McAllister with a
plea offer for Petitioner. (Gov't. Resp. Exh. C, Plea Offer to Jean Pierre Evensley ("Plea Offer")
at 1.) In the Plea Offer, Respondent estimated that if Petitioner pled guilty to the conspiracy and
attempt charges, his sentencing range, according to the United States Sentencing Guidelines,
would be 60 to 71 months. (Id. at 2.) The Plea Offer specifically explained, in bold-faced type,
that 21 U.S.C. 841(b)(1) imposed a statutory minimum sentence of 60 months. (Id.) McAllister
asserts in his declaration that he counseled Petitioner to plead guilty. (McAllister Decl. at 1-2.)

In September, 2003, Petitioner retained attorney Scott Brettschneider ("Brettschneider")
as new counsel, and the court relieved McAllister.[1] (Motion for a Writ of Habeas Corpus
("Habeas Motion") (Docket Entry # 1) at 3; 03-CR-445, Docket Entry # 25 ("Sept. 2003 Conf.

---

[1] According to Petitioner's motion, he "thought [he could get] a better deal with a more
established attorney." (Motion for a Writ of Habeas Corpus (Docket Entry # 1) at 21.)

Tr.") at 2.)  Brettschneider requested a month to familiarize himself with the case and speak with Petitioner about a plea agreement.  (Sept. 2003 Conf. Tr. at 3.)  At a status conference in October, 2003, the court scheduled a trial for November 17, 2003.  (03-CR-445, Docket Entry # 27 at 4.)

### B.    Petitioner's Trial

During the trial, Respondent introduced the testimony of three fact witnesses: Customs and Border Protection Inspector Frank Russo ("Inspector Russo"), ICE Agent Michael Giovanoni ("Agent Giovanoni"), and ICE Agent Kevin O'Malley ("Agent O'Malley").  (Tr. at 39, 58, 130.)  Respondent also introduced, inter alia, expert testimony from ICE Agent Timothy Flood ("Flood"), tape recordings of two conversations between Petitioner and Menelas, several documents that were seized from Petitioner, and Petitioner's travel records.  (Id. at 87, 91-96, 101-02, 196.)  Petitioner was represented at trial by Brettschneider, John Scarpa ("Scarpa"), and their associate John Russo ("Attorney Russo").  (Id. at 2; 03-CR-445, Docket Entry # 32.)  Brettschneider and Attorney Russo were present during the entire trial.  (Tr. at 1, 152, 340.)  Attorney Russo made the opening statement and cross-examined two witnesses.  (Id. at 31, 158, 201-02, 211.)  Brettschneider cross-examined two witnesses and delivered the closing argument.  (Id. at 53, 103, 375.)  Scarpa was not present during jury selection or the Respondent's case, but he presented the defense case.  (Id. at 231.)

### 1.    Respondent's Case

Inspector Russo testified that Menelas arrived at the American Airlines terminal at JFK on March 18, 2003.  (Id. at 41.)  Inspector Russo escorted Menelas to a baggage search area and discovered cocaine hidden in a secret compartment of Menelas's luggage.  (Id. at 45-48.)  Upon

finding cocaine, Inspector Russo arrested Menelas and turned him over to ICE Agents Giovanoni and O'Malley.  (Id. at 48-49.)

Agents Giovanoni and O'Malley testified that when they arrived at the American Airlines terminal, Menelas was wearing a cream, black, and brown sweater.  (Id. at 62, 134.)  The agents interviewed Menelas for ten to fifteen minutes and learned that Menelas had expected to meet a man with dredlocked hair at JFK.  (Id. at 62, 65, 134.)  The agents decided to conduct a controlled delivery and persuaded Menelas to cooperate with them.  (See id. at 63, 134.)  Agent O'Malley wired Menelas up with a hidden tape recording device.  (Id. at 135.)  Thus equipped, Menelas left the baggage claim area and walked into the passenger lobby.  (Id. at 66-67.)  A short time later, Petitioner and another man, later determined to be Antoine Rudden ("Antoine"), arrived in the passenger lobby.  (Id. at 67, 136.)  Petitioner walked up to Menelas and spoke with him briefly.  (Id. at 70, 137.)  Menelas then walked out of the airport terminal.  (Id. at 76, 137.)  Soon thereafter, Petitioner and Antoine followed Menelas outside.  (Id. at 77.)  Petitioner approached Menelas, spoke to him, and handed him money.  (Id. at 77, 140.)

Respondent used Agent Giovanoni to introduce into evidence recordings of the two conversations between Petitioner and Menelas.  (Id. at 57.)  Respondent also played the tapes for the jury and handed out translations of the conversations.  (Id. at 75, 78.)  In the first recording, Petitioner asked Menelas if he was "FanFan."  (Gov't. Resp. Exh. H, Tr. of Recordings ("Recordings Tr.") at 1.)  Menelas replied, "yes, FanFan."  (Id.)  Petitioner then told Menelas to go outside to the taxi stand.  (Id.)  In the second recording, Petitioner instructed Menelas to take a taxi to 223 Linden Boulevard.  (Id. at 2.)  Petitioner told Menelas to wait there until Petitioner arrived.  (Id.)

After Petitioner's second conversation with Menelas, Petitioner and Antoine walked towards the terminal's parking lot.  (Tr. at 79, 141.)  As they were walking, Agents Giovanoni and O'Malley arrested them.  (Id.)  Agents Giovanoni and O'Malley testified that they interviewed Petitioner and Antoine for approximately ten to fifteen minutes at the American Airlines terminal in JFK.  (Tr. at 80, 141-42.)  The agents then drove Petitioner and Antoine to the ICE office in Terminal Four of JFK.  (Id. at 81, 141.)

At the ICE office, Agents Giovanoni and O'Malley interviewed Petitioner for much of the night.  (Id. at 82, 142.)  Petitioner told the agents that he went to JFK at the request of his "cousin LouLou" to pick up a friend.  (Id. at 84, 154.)  During the course of the night, however, Petitioner gave four different names for the friend: Freddie, Eddie, Randy, and Gaudy. (Id. at 84-85, 154.) According to Agent Giovanoni, Petitioner said that he approached Menelas because he wanted to know "if there was anyone else still inside," and that Menelas "asked him if he was going to Brooklyn."  (Id. at 85.)  Petitioner then said that he told Menelas he was going to Long Island, not Brooklyn, and gave Menelas $20 for a taxi to Brooklyn.  (Id.)  When Agent Giovanoni asked why Petitioner "would give a stranger $20," Petitioner responded that it was "something Haitian people do for each other."  (Id. at 85-86.)  Agent O'Malley testified that Petitioner "denied ever giving an address to [Menelas]."  (Id. at 155.)

During the agents' testimony, Respondent introduced into evidence an envelope and a scrap of paper found in Petitioner's pocket when he was arrested.  (Id. at 88, 92, see also Gov't. Resp. Exh. I, Copy of Envelope ("Envelope").)  Agent Giovanoni testified that someone had written on the Envelope, in Creole, the words "cream," "sweater," "black," and "brown" as well as the phrases, "FanFan his name," "David my name," and "$2 kids."  (Tr. at 90-91.)  According

to Agent O'Malley, Petitioner stated that he did not use David as a name or a nickname.  (Id. at 157.)  Agent Giovanoni also read off the scrap of paper the words "LouLou," "$20,000," and "$4."  (Id. at 92-93.)  Petitioner explained to the agents that the word "LouLou" referred to his cousin in Haiti.  (Id. at 157.)  Petitioner did not, however, "have an explanation for the dollar amounts."  (Id.)  Respondent also introduced into evidence Petitioner's travel records, which showed that he had traveled from Haiti to JFK eight days before his arrest.  (Id. at 99-101.)

Respondent last called Agent Flood to testify about the analysis of the cocaine found in Menelas's luggage.  (Id. at 196, 207.)  The cocaine weighed 2,553 grams net and was 79% pure. (Id. at 207.)

### 2. Petitioner's Case

The defense first attempted to call Petitioner's wife, Pascale Jean Pierre ("Pascale") as a fact witness.  (Id. at 225.)  Because she had been sitting in the courtroom during Respondent's case, however, Respondent objected to her testimony.  (Id. at 226.)  Brettschneider and Attorney Russo argued that they only intended to call Pascale to testify that she went to Haiti with Petitioner in March, 2003, for the purpose of demonstrating that Petitioner's trip to Haiti was not part of the alleged conspiracy.  (Id. at 227.)  The court agreed to allow Pascale's testimony subject to the restriction that she not discuss the transaction between Petitioner and Menelas. (Id.)  According to Pascale, she and Petitioner went to Haiti in February and March of 2003 for Carnival.  (Id. at 235-36.)  When she was in Haiti, LouLou lent her his car "so that [she] could get around."  (Id. at 260.)

Scarpa then sought to elicit testimony from Pascale on her conversation with Petitioner the day he was arrested.  Respondent objected to Scarpa's questions.  (Id. at 242.)  Scarpa argued

to the court that he was trying to buttress the defense's argument that Pascale's cousin LouLou asked Petitioner to pick a friend up from the airport, and that Petitioner did not know that LouLou's friend was a drug smuggler.  (Id. at 255-57.)  The court rejected Scarpa's argument and instructed him to stop his line of questioning.  (Id. at 258.)

After Pascale's testimony, Scarpa requested a fifteen-minute recess to discuss with Petitioner whether he would testify.  (Id. at 268.)  Once the recess ended, Scarpa called Petitioner as a witness.  (Id. at 269-70.)

Petitioner testified that on the morning of March 18, 2003, Pascale asked him to pick up someone named FanFan from the airport.  (Id. at 283.)  Petitioner's understanding was that Pascale relayed the request from her cousin LouLou.  (Id.)  Petitioner remembered meeting LouLou several weeks earlier in Haiti.  (Id. at 276).  Petitioner testified that LouLou initially thought his name was David and so he was supposed to identify himself to "FanFan" as David.[2] (Id. at 283.)  Petitioner agreed to pick FanFan up as a favor to LouLou.  (Id. at 285.)

Later in the day, LouLou called Petitioner and called him by his proper name, not David.  (Id. at 284.)  This left Petitioner feeling puzzled.  (Id.)  Petitioner became increasingly worried when, on the way to the airport, he received a phone call from his cousin NerNer.  (Id. at 287.)  NerNer told Petitioner that he should not pick up "FanFan" because "LouLou is bad."  (Id.)  Petitioner resolved that he did not want to get involved and so he would send FanFan on his way without picking him up.  (Id. at 288.)

When Petitioner arrived at the airport, he walked up to Menelas and asked him if his

---

[2] Petitioner testified that he and Pascale had a dog named David, and that apparently LouLou had gotten the names confused.  (Id. at 283.)  Petitioner was very "surprised" by LouLou's confusion.  (Id.)

name was "FanFan." (Id. at 289.) When Menelas said yes, Petitioner responded that his name was "David" and told Menelas to go outside. (Id.) Petitioner testified that he wanted to send Menelas to a location with a lot of Haitians, so he told him to take a cab to 223 Linden Boulevard, an area with "a lot of Haitian restaurants." (Id. at 290.) Petitioner denied that he was involved in a conspiracy to import cocaine or that he entered into an agreement with LouLou to import cocaine. (Id. at 295.)

Petitioner also addressed the markings on the Envelope found on his person by Agent Giovanoni. The notation "$2 kids" on the Envelope meant that he should give $2 to his son for lunch money—he wrote this down because Pascale asked him to do so. (Id. at 280.) Pascale also asked him to write down FanFan's description. (Id. at 282.)

On cross-examination, Petitioner asserted that the translations of the Recordings were inaccurate in several respects. (Id. at 304, 307, 308.) In addition, Petitioner denied that he had told Agents Giovanoni and O'Malley that he was at JFK to pick up a "Freddie," "Eddie," "Randy," or "Guady;" that Menelas asked if "[he] was going to Brooklyn;" or that he gave Menelas $20 to take a taxi. (Id. at 310-13.)

Respondent then asked Petitioner whether, when ICE agents arrested him, he had a piece of paper with the name and birth date of a man named "Tom Barnett," the number "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," and the word "password" written on it. (Id. at 321.) Petitioner said that he did, but that he did not know the individual in question.[3] (Id. at 321-22.) On redirect, Petitioner testified that the document belonged to his sister and was "for a phone that she had gotten through a friend."

---

[3] During a side-bar, Respondent explained to the court that Tom Barnett had been dead for a number of years, that he had lived in Oklahoma before his death, and that the number was his social security number. (Id. at 318.)

(Id. at 323.)

After three hours of deliberations, the jury rendered a verdict finding Petitioner guilty of count two of the indictment, conspiracy with intent to distribute cocaine and, and count five, attempted possession of cocaine with intent to distribute. (Id. at 443-45; see Indictment at 2-3.)

### C. Post-Trial Motion and Appeal

On May 7, 2004, Petitioner, now represented by attorney John Jacobs ("Jacobs"), see (03-CR-445, Docket Entry # 46), filed an untimely motion to vacate his conviction and obtain a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, (Gov't. Resp. Exh. J, June 16, 2004 Order ("June 2004 Order") at 1). Petitioner alleged that his trial counsel was ineffective. (Id. at 2.) Attached to the motion were sworn affirmations from Petitioner and Pascale.

The affirmations stated that in September 2003, Petitioner and Pascale met with Brettschneider and "informed Brettschneider that [he] was not interested in taking [the] case to trial." (Gov't. Resp. Exh. K, Affirmation of Evensley Jean Pierre ("Evensley Decl.") at 1; Gov't. Resp. Exh. L, Affirmation of Pascale Jean Pierre ("Pascale Decl.") at 1.) Brettschneider did not discuss with Petitioner what would happen if Petitioner was found guilty at trial. (Evensley Decl. at 2.) Petitioner again met with Brettschneider and Scarpa on November 14, 2003, to prepare for trial. (Id.) They discussed for "approximately ten minutes the possibility that [he] would testify," but did not discuss whether Pascale would be a witness. (Id.) Petitioner and Pascale did not consent to Russo or Scarpa playing a "substantive role at [his] trial." (Id.; Pascale Decl. at 2.) "[T]he attorneys [themselves] decided that [Petitioner and Pascale] would testify" yet failed to prepare them for specific questions or for cross-examination. (Id.) In addition, Scarpa did not

9

adequately prepare Pascale's direct testimony, nor did he prepare her for cross-examination. (Pascale Decl. at 2.)

On June 16, 2004, the court denied Petitioner's motion because it was not timely filed. (June 2004 Order at 2.)

On July 30, 2005, Petitioner, represented by Jacobs, appealed his conviction to the Second Circuit. Brief for Defendant-Appellant, <u>United States v. Evensley Jean Pierre</u>, 161 Fed. Appx. 121 (2d Cir. Dec. 29, 2005) (No. 05-0941 cr). In an opinion dated December 29, 2005, the Second Circuit declined to address Petitioner's ineffective assistance of counsel claim because it required analysis of "various factual assertions about his counsel's performance that would be better addressed in the district court." <u>Evensley Jean Pierre</u>, 161 Fed. Appx. at 121. The court rejected Petitioner's other evidentiary claim and affirmed the judgment. <u>Id.</u>

### D.     The Instant Motion

On March 25, 2006, Petitioner filed the instant motion for a writ of habeas corpus pursuant to 28 U.S.C. § 2255. Petitioner argues that his trial counsel was constitutionally deficient because: (i) Brettschneider delegated the defense case to Scarpa, who was not present during Respondent's case; (ii) Pascale, a fact witness, was in the courtroom during Respondent's case, which resulted in an order limiting her testimony; (iii) Scarpa did not prepare Petitioner or Pascale to testify; (iv) the attorneys were not prepared for trial; (v) his counsel failed to challenge the Presentence Investigation Report ("PSR") prepared by the United States Probation Office; (vi) Brettschneider failed to advise Petitioner as to whether a guilty plea should be entered; and

(vii) Brettschneider failed to pursue plea negotiations.[4]  Petitioner's motion requests (i) that his case be "remanded to this court for an evidentiary hearing" and (ii) that this court vacate his sentence and grant him a new trial.  (Habeas Motion at 6, 17-21.)

On March 12, 2007, Respondent filed a timely response to Petitioner's motion.  (Gov't. Resp. at 28.)  Respondent argues that trial counsel's actions were not ineffective.  (Id. at 17-23.) In the alternative, Respondent argues that Petitioner did not suffer any prejudice.  (Id. at 23-27.) Finally, Respondent contends that Jacobs, Petitioner's counsel at the time, reviewed the PSR and advised the court that there were no factual issues that needed to be addressed.  (Gov't. Resp. at 23.)  In its reply, Respondent included affidavits from Brettschneider, Russo, and Scarpa that contradict Petitioner and Pascale's affirmations.

## II.     LEGAL STANDARD

### A.     Need For An Evidentiary Hearing

Petitioner's affirmations and Respondent's affidavits present conflicting factual assertions.  The threshold issue, therefore, is whether the court must hold an evidentiary hearing in order to adjudicate Petitioner's motion.  See 28 U.S.C. § 2255.[5]  Section 2255 grants the district court substantial discretion to decide whether "allegations of facts outside the record can be fully investigated without requiring the personal presence of the prisoner."  Chang v. United

---

[4] Petitioner also requests that the court re-examine the Second Circuit's decision that the court erred by admitting testimony that Menelas was supposed to be met by a man with dredlocked hair.  Because this claim is barred by res judicata, see, e.g., Tsimmer v. Gantner, 550 F. Supp. 2d 438, 446 (S.D.N.Y. 2008), the court declines to consider Petitioner's request.

[5] Under section 2255, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."

States, 250 F.3d 79, 85 (2d Cir. 2001) (quoting Machibroda v. United States, 368 U.S. 487, 495 (1962)).  It is an abuse of discretion for a district court to summarily dismiss a claim that is (i) "not so clearly bereft of merit as to be subject to dismissal on its face" and (ii) involves "off-the-record interactions with . . . trial counsel [that] cannot be determined by examining the motion, files, and records before the district court."  Chang, 250 F.3d at 85; see also Armienti v. United States, 234 F.3d 820, 825 (2d Cir. 2000) ("[A]ctions taken by counsel outside the presence of the trial judge [cannot] ordinarily be resolved by him without such a hearing.").  The court, however, "may employ a variety of measures [other than summary dismissal] in an effort to avoid the need for an evidentiary hearing."  Chang, 250 F.3d at 86 (quoting Blackledge v. Allison, 431 U.S. 63, 81-82 (1977)).  One appropriate measure that a district court can employ in lieu of an evidentiary hearing is to "[supplement] the record [with] a detailed affidavit from trial counsel credibly describing the circumstances concerning [the petitioner's] claim."  Chang, 250 F.3d at 85; see, e.g., Riggi v. United States, (JSR) No. 04 Civ. 7852, 2007 WL 2245595, *9 (S.D.N.Y. Aug. 06, 2007) (holding that there is "no reason to hold an evidentiary hearing [when the court is] faced with . . . an assertion by a petitioner that he requested to file a notice of appeal and an attorney affidavit contradicting this assertion").

Petitioner's assertions are implausible, but they are not so "bereft of merit" that summary dismissal is proper.  The record of this case, however, includes sworn affidavits from Petitioner, Pascale, and trial counsel describing Petitioner's off-the-record interactions with trial counsel.  Because these affidavits provide detailed factual accounts of the events underlying Petitioner's claims, an evidentiary hearing "would not offer any reasonable chance of altering . . . the facts" and is therefore unnecessary.  Chang, 250 F.3d at 86.  The court will therefore resolve all

disputed factual matters on the basis of these affidavits.

**B.    Ineffective Assistance of Counsel**

In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the Supreme Court established a two-part test for determining whether a petitioner's Sixth Amendment right to counsel has been violated.  Under <u>Strickland</u>, a petitioner must prove that: (i) his "counsel's representation fell below an objective standard of reasonableness" and (ii) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at 688, 694.  The court must "[consider] all of the circumstances at the time the claimed errors occurred."  <u>Cuevas v. Henderson</u>, 801 F.2d 586, 589 (2d Cir. 1986).

To succeed on a claim of ineffective assistance of counsel, the defendant must prove "both incompetence and prejudice".  <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 381 (1986).  The court, however, can address these elements in any order, and if the court can "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."  <u>Strickland</u>, 466 U.S. at 697.

The reasonableness of counsel's decisions "may be determined or substantially influenced by the defendant's own statements or actions" before and during trial.  <u>Id.</u> at 691.  When examining the defendant's statements and actions, the court should evaluate any exculpatory post-conviction assertions in light of whether they can be supported by competent evidence.  <u>See</u> <u>Haouari v. United States</u>, 510 F.3d 350, 354 (2d Cir. 2007).  The primary test for determining the reliability of affidavits from the defendant and from trial counsel is whether they provide a "description of events [that is] eminently credible."  <u>Chang</u>, 250 F.3d at 86.

## III. DISCUSSION

Petitioner's motion makes several allegations of constitutionally defective representation. The court construes Petitioner's motion as presenting three claims: first, that Brettschneider's failure to advise Petitioner on a plea offer prejudiced the eventual sentence, second, that alleged errors during trial prejudiced the jury's verdict, and third, that Brettschneider failed to challenge errors in the PSR that prejudiced the sentence. Respondent argues that Petitioner's attorneys were not ineffective before, during, or after trial, and in the alternative that Petitioner was not prejudiced by any purported errors committed by his attorneys.

### A. Failure To Advise Petitioner To Plead Guilty

#### 1. *Prejudice*

Petitioner argues that Brettschneider's failure to expressly advise him to accept Respondent's plea offer was prejudicial. Such a failure may be prejudicial if the defendant would have pled guilty had he known of the agreement and been properly advised. Cullen, 194 F.3d 401, 405 (2d Cir. 1999). A defendant who contends that he would have pled guilty but for counsel's failure to provide advice must present "objective evidence . . . beyond his own testimony." Purdy v. Zeldes, 337 F.3d 253, 259 (2d Cir. 2003).

Petitioner's assertion that Brettschneider failed to expressly advise him on Respondent's Plea Offer is unsupported by any evidence other than his and Pascale's self-serving affidavits. According to McAllister's declaration, Petitioner rejected a plea bargain offering the statutory minimum sentence and fired McAllister for suggesting he plead guilty. (McAllister Decl. at 1-2.) According to Attorney Russo's declaration, Petitioner discussed with counsel the risks and benefits of going to trial as compared to pleading guilty. (Gov't. Resp. Exh. N, Affirmation of

14

Jason Russo ("Attorney Russo Decl.") at 2.) According to Brettschneider's declaration, Petitioner insisted on going to trial even after Brettschneider warned him of his potential sentence under the Sentencing Guidelines. (Gov't. Resp. Exh. M, Declaration of Scott Brettschneider ("Brettschneider Decl.") at 2.) Petitioner's motion provides no "objective evidence" that these events did not transpire. Considering, as the court finds, that Petitioner rejected a plea bargain offering the statutory minimum sentence—the best plea bargain he could have hoped for—and ignored Brettschneider's warnings regarding the Sentencing Guidelines, the court finds that additional advice from counsel surely would not have led Petitioner to plead guilty.

> ### 2. *Performance*

Because Petitioner cannot prove prejudice, this court "need not consider the objective reasonableness of counsel's actions." United States v. Birkin, 366 F.3d 95, 101 (2d Cir. 2004). However, even if Petitioner had suffered prejudice, his claim would fail because Brettschneider's decision not to offer explicit advice on whether to plead guilty was not objectively unreasonable.

Although a failure by counsel to offer any advice on whether to accept a plea bargain falls below Strickland's objective standard of reasonableness, Cullen, 194 F.3d at 403, counsel can generally discharge his obligation by informing the defendant of the strength of the case against him and the possible sentence of incarceration that may be imposed after a guilty plea as compared to a guilty verdict, Purdy v. United States, 208 F.3d 41, 45 (2d Cir. 2000). Counsel is not required to advise the defendant on whether or not to plead guilty and "must take care not to coerce a client into either accepting or rejecting a plea offer." Id.

Petitioner does not dispute Brettschneider, Attorney Russo, and Scarpa's statements that

they informed him of the strength of the case against him and the possible sentence of incarceration. Instead, citing Boria v. Keane, 99 F.3d 492 (2d Cir. 1996), Petitioner states that Brettschneider breached his obligation to give express advice as to whether pleading guilty would be desirable. The Second Circuit, however, has explicitly rejected the notion that Boria created a "*per se* rule that . . . counsel must always expressly advise the defendant whether to take a plea offer." Purdy, 208 F.3d at 48. Counsel must only "[inform the defendant] fully of the strength of the government's case against him, together with the nature of the government's plea offer." Id.. The obligation to offer explicit advice only exists in the limited circumstances when (i) the defendant faces an extreme sentencing disparity between pleading guilty and going to trial; (ii) "the defendant, professing innocence, refuses to consider the matter;" and (iii) there is "no reasonable chance of acquittal." Id. at 46 (quoting Boria, 99 F.3d at 496, 498)).

Petitioner does not meet any of these requirements. Petitioner faced 78 to 97 months incarceration if he lost at trial, compared to 60 to 71 months if he pled guilty. This difference cannot compare with the "extreme" disparity in Boria—twenty years to life at trial and one to three years with a plea. Id. at 47. Petitioner is not a defendant who "refuses to consider" a plea offer—in fact his motion states that he considered Respondent's plea offer and decided that he could get "a better deal" by retaining a different attorney. Finally, although Respondent presented substantial evidence that Petitioner engaged in a conspiracy to import cocaine, there was some reasonable chance of an acquittal; for example, the jury could have believed that Petitioner did not know that "FanFan" was a drug courier. Cf. Boria, 99 F.3d at 495 n.4 (noting trial counsel's testimony that "a drug case under circumstances of a possession or direct sale to an undercover agent is probably one of the most difficult cases to defend"); Purdy, 208 F.3d at

42, 47 (distinguishing from <u>Boria</u> a conspiracy by "military parts suppliers [to pay] kickbacks to federal contractors to obtain supply contracts" partly because the case was "considerably more complex").

Because Petitioner has not shown that Brettschneider should have given him explicit advice, he can only meet the performance prong of <u>Strickland</u> if he proves that counsel failed to inform him of the plea offer and of the strength of Respondent's case. This claim is not supported by any evidence in the record. According to Brettschneider's declaration, Petitioner discussed with counsel the risks of going to trial. (Brettschneider Decl. at 2; Attorney Russo Decl. at 2). Counsel went so far as to conduct a mock cross-examination of Petitioner and Pascale in an attempt to show them the strength of Respondent's case. (Scarpa Decl. at 2); <u>see</u> <u>Purdy</u>, 208 F.3d at 47 (listing a mock cross-examination as an indicator that counsel informed defendant of the strength of the government's case). Brettschneider therefore provided effective assistance of counsel even though he did not provide explicit advice on a guilty plea.

Petitioner's second argument, that Brettschneider pushed him to go to trial over Petitioner's objections, is also without merit. As previously discussed, Petitioner offers little more than conclusory assertions that Brettschneider, not Petitioner, wanted to take his case to trial. <u>See</u> <u>supra</u> 14-15; <u>Haouari</u>, 510 F.3d at 354. His claim lacks any "eminently credible" evidence and therefore fails the performance prong of <u>Strickland</u>. <u>See</u> <u>Miranda v. United States</u>, (ILG) No. 98 CV 1490, 2008 WL 2561990, *8 (E.D.N.Y. June 25, 2008) (after weighing the credibility of petitioner and trial counsel's affidavit, accepting as fact trial counsel's statements

that he warned petitioner of the risks of going to trial).[6]

## B.  Errors In the Conduct of Petitioner's Trial and Sentencing Proceedings

Petitioner's motion identifies five purported errors committed by defense counsel during and after trial: (i) Brettschneider delegated the defense case to Scarpa, who was not present during Respondent's case; (ii) Pascale, a fact witness, was in the courtroom during Respondent's case, which resulted in an order limiting her testimony; (iii) Scarpa did not prepare Petitioner or Pascale to testify; (iv) the attorneys were not prepared for trial; and (v) Brettschneider failed to challenge the PSR.  The court organizes Petitioner's arguments into two claims: (i) that counsel committed several prejudicial errors before and during trial; and (ii) that counsel failed to challenge the PSR.  Because determining whether counsel erred before and during trial is a detailed factual question, the court will first determine whether this claim can be disposed of under the prejudice prong of Strickland.  See Strickland, 466 U.S. at 697; Birkin, 366 F.3d at 101.  On the other hand, Brettschneider's alleged failure to challenge the PSR is a simpler factual issue which the court will address under the performance prong of Strickland.

### 1.  Errors Before and During Trial

An error by counsel is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  The court should look to the "cumulative weight of error" in order

---

[6] The court notes that Miranda, a drug courier, was charged with conspiracy and possession with intent to distribute cocaine in violation of section 841(b)(1)(A) and was represented at trial by Scott Brettschneider.  Brettschneider's affidavit in Miranda, which was credited, addressed substantially the same issues as his affidavit in this case: that the petitioner insisted on going to trial and that Brettschneider warned the petitioner of his potential exposure under the Sentencing Guidelines.  Id. at *2, *5.

to determine whether the prejudice "reache[s] the constitutional threshold." Lindstadt v. Keane, 239 F.3d 191, 202 (2d Cir. 2001). Compare Hernandez v. United States, 202 F.3d 486, 489 (2d Cir. 2000) (holding that prejudice is presumed from "counsel's un-excused failure to bring a direct appeal from a criminal conviction upon the defendant's direction to do so") with United States v. Abad, 514 F.3d 271, 276 (2d Cir. 2008) (holding that, because "three cooperating witnesses linked [the defendant] directly to the killing of [the victim], and also testified that [the defendant] bragged about it afterwards," defendant could not show that he was prejudiced by counsel's failure to file a motion to dismiss on speedy trial grounds and a motion to suppress evidence of prior bad acts).

When a petitioner claims that trial counsel's allegedly ineffective assistance prejudiced the jury's verdict, the court must determine whether the verdict is supported by "overwhelming record support." Strickland, 466 U.S. at 695-96. If the conspiracy case against petitioner includes multiple, corroborating witnesses, see United States v. Guang, 511 F.3d 110, 120 (2d Cir. 2007), tape recordings or wire intercepts of incriminating conversations, see United States v. Garcia, 413 F.3d 201, 224 (2d Cir. 2005), or if law enforcement testifies that the petitioner made false exculpatory statements post-arrest, see Miranda, 2008 WL 2561990 at *1-2, *8, it is unlikely that the petitioner will be able to make the required showing of prejudice. See also Pointdexter v. Nash, 33 F.3d 372, 380 (2d Cir. 2003) (describing government's case as "overwhelming" in a conspiracy prosecution built on "an audio tape, the testimony of an informant, and [the petitioner's] statements to the police").

Having reviewed the trial record, this court finds that the jury's verdict has overwhelming support in the record. Agents Giovanoni and O'Malley testified that Menelas told them that he

was to deliver two-and-a-half kilograms of cocaine to a man with dredlocked hair named "David." Their testimony also indicated that "David" would use a pre-arranged code-word, "FanFan," to identify himself to Menelas. The Recordings showed that Petitioner used this codeword when he met Menelas, directed Menelas to a particular location where the two would meet, and generally acted in such a way as to suggest he was trying to avoid detection by law enforcement. The writing on the Envelope indicated that Petitioner had planned this meeting, writing down the colors of the sweater Menelas would wear and using a code to signify how much cocaine he would be receiving. The agents also testified to Petitioner's evasive and false statements post-arrest. All of this evidence suggested Petitioner's knowing participation in a conspiracy with Menelas and LouLou to possess and distribute cocaine.

As opposed to the overwhelming evidence introduced by Respondent, Petitioner's presentation of his case consisted largely of his and Pascale's testimony. To credit Petitioner's testimony, the jury would have had to believe, among other implausibilities, that: Petitioner's distant cousin LouLou confused Petitioner's name with that of the family dog, David; even though he gave his only child lunch money every day, Petitioner had to remind himself by writing "$2 *kids*" on a document that also described a drug courier; Petitioner's cousin NerNer called and warned Petitioner that LouLou was a criminal; Petitioner referred to himself as "David" in his meeting with "FanFan" even though his name was Evensley; and Petitioner kept someone else's name and birth-date and an accompanying nine-digit number on his person because his sister used this information as a phone password. During cross-examination, Petitioner cast doubt on the credibility of his case when he denied that he made to Agents Giovanoni and O'Malley any of the post-arrest statements to which they had testified, including:

the reason he approached Menelas at JFK, (see Tr. at 85),

> Q: You told agents that you only approached Mr. Menelas, who you know as FanFan, to ask him if anybody else was still inside left on the flight, is that right?
> A: No, it was not. I did not say that, Your Honor.

(Id. at 309); the multiple names Petitioner gave to LouLou's friend, (see id. at 84-85, 154),

> Q: And you told the agents that the person's name that you were there to pick up was Freddie?
> A: I did not say that.
> Q: You told them the name was Eddie?
> A: I did not say that.
> Q: You told them the person's name was Randy?
> A: I did not say that.
> Q: And then later on in the interview you told them that the person you were there to pick up was Guady?
> A: I did not say that.

(Id. at 310.); and the conversation between Petitioner and Menelas, (see id. at 85),

> Q: You told agents that FanFan asked you if you were going to Brooklyn or told you that he needed to go to Brooklyn?
> A: No, I did not.
> Q: You told agents that you told FanFan that you were going to Long Island?
> A: I did not.
> Q: And you told agents that you gave FanFan $20.00 so that he could take a cab?
> A: I did not.

(Id. at 311). Petitioner also changed his story multiple times on the stand. First, he "did not tell the agents anything;" second, he "made no statements to the agents besides LouLou in the beginning;" third, he discussed his "application to the N.Y.P.D. because it was on the same piece of paper as the LouLou piece of paper;" and fourth, the agents "didn't even show [him the] piece of paper." (Id. at 312-14.) The jury thus had ample reason to doubt Petitioner's testimony.

Given the overwhelming evidence against Petitioner, even if counsel had been better

prepared,[7] or if Pascale had not been precluded on account of her presence in the courtroom from testifying about LouLou's phone call to her and the markings on the Envelope, there is no reasonable possibility that the jury would have rendered a verdict of not guilty.[8]  Although Pascale's testimony might have corroborated certain aspects of Petitioner's testimony, that testimony was, on the whole, so implausible that corroboration would not have changed the jury's assessment of Petitioner's credibility.  Having considered the "cumulative weight of error," see Lindstadt, 239 F.3d at 202, the court therefore dismisses Petitioner's claim on prejudice alone, see Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005) ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.").

>    2.    *Failure to Challenge the PSR*

Courts have held that it is per se unreasonable to fail to object to an erroneous PSR.  See Johnson, 313 F.3d 815, 818 (2d Cir. 2002).  Citing Johnson, Petitioner argues that his trial counsel's failure to review the PSR could have resulted in a higher sentence than Petitioner would have otherwise received.  This claim is entirely without merit for Petitioner has identified

---

[7] The court has considered Petitioner's argument that Scarpa, who was not present during Respondent's case, could not have effectively presented the defense case.  During the trial, Brettschneider and Attorney Russo assured the court that they discussed Respondent's case with Scarpa before he began his presentation of Petitioner's case.  (Id. at 248, 250.)  In any event, in light of the discussion above, even if Scarpa's performance was improper it did not prejudice Petitioner.

[8] Petitioner argues that he suffered prejudice because Brettschneider, Attorney Russo, and Scarpa's performance "can easily be called into question."  (Habeas Motion at 16).  This argument proves nothing since Strickland requires the petitioner to prove a "reasonable probability" that the outcome of the instant case would have been different but for counsel's errors, not simply that an outcome "can" happen.

no errors in the PSR that his trial counsel should have brought to the court's attention.  See id.
(holding that trial counsel was ineffective for failing to object to a PSR that erroneously
calculated the petitioner's offense level to be 32 instead of 30).

## IV.    CONCLUSION

For the reasons set forth above, Petitioner's motion for a writ of habeas corpus is denied.
As Petitioner has not made a substantial showing of the denial of a constitutional right, a
certificate of appealability shall not issue.  See 28 U.S.C. § 2253(c)(2).  The court certifies that
any appeal from this order would not be taken in good faith.  See Coppedge v. United States, 369
U.S. 438, 444 (1962).  The Clerk of Court is directed to enter judgment for Respondent and to
close this case.


SO ORDERED.

Dated: August 22, 2008                                          /s Nicholas G. Garaufis
Brooklyn, New York                                       NICHOLAS G. GARAUFIS
                                                         United States District Judge